## THE W. D. ANDERSON.*

### ATLANTIC REFINING CO. v. SMITH.
### No. 6369.

Circuit Court of Appeals, Third Circuit.
Dec. 31, 1937.

Lewis, Wolff & Gourlay, of Philadelphia, Pa. (Otto Wolff, Jr., of Philadelphia, Pa., of counsel), for appellant.

Walter B. Gibbons, Samuel B. Fortenbaugh, Jr., and George F. Blewett, all of Philadelphia, Pa., Arthur L. Obre, of New York City, and Herman Steerman, of Philadelphia, Pa. (Walter B. Gibbons, of Philadelphia, Pa., of counsel), for appellees.

Before BUFFINGTON, DAVIS, and BIGGS, Circuit Judges.

BUFFINGTON, Circuit Judge.

In the final analysis this case, with its record of eight hundred pages, centers into a few decisive facts. In the court below, sitting in admiralty, the Atlantic Refining Company, owner of the oil tanker W. D. Anderson, petitioned for exemption of liability and, in case that was denied, for limitation of liability. The court referred the matter to a master, who recommended the petition be granted. On hearing, the court denied the petition as to exemption of liability, but allowed the petition as to limitation of liability. Thereupon Atlantic took this appeal.

The case grows out of an explosion on board the W. D. Anderson, wherein several men were killed and a number of others injured. The representatives of the dead brought suit in a state court, as did also the surviving injured. After proofs and final hearing, the trial judge filed a lengthy opinion which discussed the evidence and the law bearing on the case. After full consideration by this court, we find no error

*Writ of certiorari denied 58 S.Ct. 764, 82 L.Ed. —.

on his part and we might well limit ourselves to affirming its decree on his opinion. In view, however, of the importance of the case, we discuss it at further length, although doing so is but an attempt to clothe in different language what has been already stated in the opinion below.

From the proofs it appears that some months before the explosion, the W. D. Anderson was damaged by grounding. She, however, continued in her trade as an oil tanker until it was determined to have her injuries repaired by the shipyard corporation (hereafter called shipyard). Accordingly, she was delivered, steam up, by Atlantic to shipyard on the morning of June 7th, and the explosion occurred six or seven hours later. The proofs tended to show that the Anderson's foremost compartment, known as the "forepeak," had no port holes or ventilation, carried no oil, but at times water ballast. This forepeak was lined with cement which was an oil absorbent. The compartment immediately after the forepeak was an oil cargo tank. After the grounding of the Anderson, it had been found, on sounding, that this oil tank compartment showed a loss of half a foot of oil and that the missing oil had gone from the oil compartment into the forepeak water tank. Thereafter this oil was not removed from the forepeak, but, on discharge of cargo, most of the oil had drained back into the cargo oil tank. On further investigation by Anderson's officers, it was found a rivet was missing in the wall between the two tanks. This left a hole some seven-eighths inches in diameter and somewhat above the tank bottoms. The hole was then plugged and cemented, but the oil below the level of the hole, which could not drain back, remained on the forepeak floor. In addition, the cement lining would absorb the oil. In that regard the proof is:

"Q. And you heard the testimony of the captain that in March, of 1934, there was a seepage of oil from the number 1 deep tank into the forepeak tank. Now, Doctor, if that was permitted to drain out by gravity back into the number 1 deep tank, would that or would that not drain out cleanly? A. No, sir, it would not drain out clean.

"Q. What would it leave? A. It would leave there an adherent surface of oil on every surface that the oil came in contact with during the voyage of that vessel from the time at which a leak developed until the point at which number 1 deep tank was emptied. That film would be considerably thicker and deeper in all portions of the forepeak tank that had the cement wash, because from my practical knowledge I know that oil will be soaked up by cement. In fact, it doesn't take expert opinion for that. We see it all over the country roadsides, that ordinary lubricating oil is dropped on the cement, and while it is exposed to all sorts of weather conditions, the rain and high temperatures of the direct sunlight, that oil works in the concrete and is never entirely removed."

Pertinent thereto, the chief engineer testified:

"Q. How did you dispose of that inch and a half below the level of the hole? A. I didn't dispose of that.

"Q. What was done with that? A. I don't know.

"Q. As far as you know, you went away and left it."

The master gave orders as follows:

"Q. I understand you after the oil ran out you wiped the forepeak? A. I gave those orders to the chief mate, yes, sir.

"Q. You don't know whether it was ever done, do you? A. I took for granted it was, sir.

"Q. You didn't examine to see? A. No, sir. * * *

"Q. What efforts did you make to clean out that four to five inches in that one compartment of the forward compartment? A. I mentioned the fact to the chief officer to have it cleaned out, sir. He is in charge of such work.

"Q. That is all? A. Yes, sir.

"Q. That is all you did in connection with it from that point forward? A. Yes, sir."

The chief mate testified as to what followed the captain's order:

"Q. Did you do anything pursuant to the captain's orders in March at Brunswick, or at sea after leaving Brunswick, to clean out any oil or dirt residue that might have remained in the bottom of the forepeak compartment? A. No, sir, nothing was cleaned out.

"Q. Do you recall the captain's requesting or instructing you to clean it out? A. Yes, sir, but I thought that was just a suggestion.

"Q. You thought it was just a suggestion? A. Yes, sir.

"Q. You did nothing about it? A. No, sir. * * *

"Q. What did you do to get rid of that oil that was pooled in the bottom? A. At the time I discovered it—

"Q. I mean after all you have described and found, beyond that what did you do? A. With the oil in the forepeak?

"Q. Yes. A. Why, I passed the remark to the chief mate while I was still there we have to get this cleaned up as soon as we have a chance.

"By Mr. Wolff: Q. What was left there was a mixture of oil and water, I take it? A. Oil and water which had come through the hole."

It will be noted that the Anderson's chief mate knew when the acetylene burner work was started and knew that no steaming or washing of the forepeak had been done after arrival at the dry dock.

"Q. And you were on the vessel when the work was started on the vessel? A. Yes, sir.

"Q. And you knew at the time that work was started on the vessel just how much steaming and washing had been done on the vessel? A. Yes, sir.

"Q. And you knew that there had been no steaming or washing done on the vessel after it arrived at the Kensington Shipyard? A. No, sir; no steaming or washing done.

"Q. There was no steaming or washing done? A. No, sir.

"Q. You knew the men were working on the forepeak tank with these acetylene burners? A. Yes, sir; I seen them working there.

"Q. And you didn't say anything to them? A. No sir."

Accordingly, the riveters went to work, the proof being:

"Q. You worked there from about ten minutes of four until about what time? A. Five o'clock, five minutes to five.

"Q. Now, wait a minute, didn't you knock off for supper? A. Half past four we knocked—twenty-five after four we knocked off for supper.

"Q. Yes, and up to that time about how many rivets had had the countersink burned off and the rivets knocked into the forepeak? A. About one hundred and fifty."

The further proof as to oil being found in the forepeak tank the day after the explosion was:

"Q. Now, when you went down into the tank on the morning of the 8th you found some fluid on the deck of the forepeak tank, didn't you? A. In the forepeak.

"Q. Yes? A. As far as the broken plate.

"Q. And what kind of a fluid was that? A. It was dirty looking oily water."

The proof of another witness was:

"Q. What was the condition of the inside of the forepeak tank? A. Well, it showed evidences of oil.

"Q. Well, what was the nature of the lining of the forepeak tank? A. Why, it had been cemented up to a certain point and some of that cement was loose, and we pried off some pieces of it and we found what was apparently oil.

"Q. Was that on the same side of the forepeak tank that the plate was off? A. It was on the forward side of the forepeak tank.

"Q. Yes, was it on the port or starboard side? A. Port side."

A sample of this oil and water was analyzed, with the result:

"Q. Give us the date and— A. I received the sample, six ounce bottle contained approximately four fluid ounces of a liquid, about three fluid ounces of water and one fluid ounce of an oily substance on the top. (The witness produced a bottle)

"The Witness: I made an examination of it, saponified for saponifiable matter, and also for the flash point, to see if it flashed, and came to the conclusion that it was a petroleum product.

"Q. You say it had about four fluid ounces? A. Four fluid ounces of the liquid altogether.

"Q. In the sample submitted to you? A. Yes, in the sample submitted, yes.

"Q. You say about three ounces of that was water? A. Yes.

"Q. And one ounce of an oily substance? A. One ounce of an oily substance. * * *

"Q. Doctor, you didn't make any tests to determine whether this what you call an oily substance was inflammable? A. I ran what I would call a preliminary flash test, in other words, a small quantity I put in a small dish and heated and then ran a taper, lighted taper over, and found that it did flash at approximately 150 degrees Centi-

grade—or, Fahrenheit, pardon me, 150 degrees Fahrenheit."

The repairs of the Anderson, in the view of all parties, involved the use of red hot rivets with the inflammable presence of great heat and the equally dangerous explosive agency of oil and oil absorbing cement. The failure of the Anderson and shipyard to provide against the dangers of explosion is clear, and Anderson having full knowledge of the existence of these highly dangerous elements of oil and red hot rivets, the court was fully justified in believing Anderson's officers knew of the presence of oil in the forepeak and that shipyard was not told that it still remained there. What part the shipyard had in bringing about the accident we are not here passing upon.

So regarding, the judgment is affirmed.