## THE VENICE MARU.

### Petition of KABUSHIKI KAISHA KAWASAKI ZOSENJO et al.

District Court, S. D. New York.
March 31, 1941.

Crawford & Sprague, George C. Sprague and Roy Chamberlain, all of New York City, for petitioners.

Hill, Rivkins & Middleton, Thomas H. Middleton, and Eugene P. McCue, all of New York City, for varous cargo claimants.

Hatch & Wolfe, Carver W. Wolfe, and Rolf T. Michelsen, all of New York City, for Seeman Brothers, Inc.

Bigham, Englar, Jones & Houston, T. Catesby Jones and Ezra G. Benedict Fox, all of New York City, for various cargo claimants.

BONDY, District Judge.

The petitioners Kabushiki Kaisha Kawasaki Zosenjo, owner, and Kawasaki Kisen Kabushiki Kaisha, hereinafter referred to as the K Line, bareboat charterer of the steamship "Venice Maru", seek exoneration from or limitation of liability for cargo loss and damage arising out of a fire aboard the "Venice Maru".

July 5th, 1934, the "Venice Maru" with some general cargo aboard arrived at Kobe where the main offices of the petitioners were located. At Kobe more general cargo and 1,900 tons of sardine meal in 38,000 bags were taken aboard, to be carried to Atlantic Coast ports in the United States via Panama Canal. Of the 38,000 bags, 13,312 were stowed in No. 1 lower hold, 11,884 in No. 3 lower hold, 6,735 in No. 6 lower hold, and 6,069 in No. 3 'tween deck.

1,087 cases of porcelain goods were thereafter loaded on the weather-deck at Nagoya and about 595 additional cases of porcelain goods were transferred from the ship's hold to the weather-deck at Yokohama, from which the "Venice Maru" sailed July 13th, with all holds full and with 1,682 cases on the weather-deck covering most of the free deck space and the after two-thirds of No. 1 weather-deck hatch. After encountering heavy rains which prevented as much ventilation as was anticipated to under deck cargo, the "Venice Maru" arrived at Los Angeles July 29th, where 91 tons of cargo were discharged.

The "Venice Maru" left Los Angeles July 30th for Balboa with her weather-deck and the after two-thirds of No. 1 weather-deck hatch still covered by cargo. She encountered fine but hot weather.

Early in the morning of August 6th, smoke was observed coming out of the ventilators leading into No. 1 lower hold. Some of the bags of sardine meal stowed therein were found to be heating and giving off smoke. Notwithstanding efforts to control the situation fire broke out, resulting in damage to and destruction of cargo by fire and water used to extinguish it.

The petitioners contend that the fire was caused solely by the inherent nature of the meal which rendered it unfit for transportation to the United States. The claimants contend that the fire was caused by negligent stowage of meal in too large a quantity in No. 1 lower hold without adequate means of ventilation for the long voyage from Kobe via Panama to New York and other Atlantic Coast ports of the United States.

The record discloses that the meal shipped in the "Venice Maru" consisted of Japanese sardine meal manufactured in Japan in the usual manner and that it was merchantable and fit for transportation by sea from Kobe to New York if properly stowed and ventilated. All analyses excepting only the analysis made by one of the shipper's competitors disclose that the moisture content of samples of the meal varied between 7.87% and 9.28%, and the oil content between 6.84% and 8.54%, well within the range of high grade Japanese sardine meal.

The meal was packed, as was usually done, in second-hand bags. Even assuming there was grain dust on some of the bags, the risk of spontaneous combustion was not thereby increased.

No. 1 lower hold, in which 13,312 bags were stowed, was a large cargo compartment, about 60 feet long, about 46 feet wide and from 20 to 23½ feet deep, with a 'tween deck compartment 9½ feet deep and a shelter-deck compartment 8 feet deep above it. The meal was stowed in a substantially solid mass and occupied substantially the entire hold except a foot or two along the bulkheads and sides, and between the top of the cargo and overhead deck beams and a channel about one foot wide running athwartships through the middle of the stow. Five rows of rice ventilators extended fore and aft in the 5th, 10th and 16th tiers of bags and six rows of such ventilators extended athwartships in the 6th, 11th and 17th tiers of the stow. These were connected with vertical rice ventilators placed at the four corners of the hatchway.

The permanent ventilating system of the "Venice Maru" was sufficient for the carriage of general cargo. Sardine meal, however, has been recognized as an hazardous cargo subject to heating and to spontaneous combustion. Properly stowed in small lots adequately ventilated it had been frequently carried safely by sea from Japan to the United States in 'tween decks and in holds, notwithstanding its well-known propensity to spontaneous combustion. Only a small quantity of the meal so shipped to the United States was better in quality than that shipped on the "Venice Maru". The variations that must have existed in the moisture and fat contents of the meal in the bags did not interfere with its safe transportation.

The K Line before the shipment in question had experience in the carriage of Japanese sardine meal from Japan to the Pacific Coast of the United States and to a lesser extent to the Atlantic Coast ports of the United States. It, however, experienced trouble from overheating of sardine meal on five of its vessels commencing with the voyage of the "Montreal Maru" sailing from Yokohama, September, 1933. In each case the overheating occurred after the vessels had left Los Angeles on their way to the Atlantic Coast notwithstanding that rice ventilators had been used on two of these ships, the "Nichiyo Maru" and the "Tohsei Maru", both of which arrived in New York in May, 1934, before the "Venice Maru" had sailed from Japan.

The effect of the use of rice ventilators placed throughout the stow was unknown, uncertain and speculative. It may be of interest to note that some of the meal which was discharged at Balboa for ventilation was restowed on the "Venice Maru" and divided into small lots with channels between them in accordance with the block and channel method which came into general use in 1935, when it was realized that the experiments with rice ventilators proved unsatisfactory.

The evidence does not establish any custom or usage in the carriage of fish meal from Japan to Atlantic Coast ports which justified the stowing of 665.6 tons of fish meal, with or without rice ventilators, in a substantially solid mass so as almost to fill a lower hold.

■ I believe that the stowage of 665.6 tons of sardine meal in a substantially solid mass in the lower hold for the long voyage from Kobe to Atlantic Coast ports via the Panama Canal, constituted negligence and was a proximate cause of the fire, in that, even assuming that the rice ventilators were used in the manner claimed by the K Line, insufficient ventilation was provided. See The Nichiyo Maru, D.C., 14 F.Supp. 727, affirmed 4 Cir., 89 F.2d 539; Cf. The Willfaro, D.C., 9 F.2d 940, affirmed 9 Cir., 9 F.2d 622; and see The Ferncliff, D.C., 22 F.Supp. 728, in which a better system of rice ventilators apparently was resorted to.

The nature of sardine meal and the necessity of exposing a sufficiently large part thereof to circulating air have been so thoroughly considered by Judge Chesnut in The Nichiyo Maru, supra, and The Ferncliff supra, that further reference thereto would not serve any useful purpose.

The K Line contends that it is exonerated from all liability because the loss and damage resulted from fire not caused by its design or neglect. See Fire Statute—46 U.S.C.A. § 182.

■ The duty to stow cargo properly is considered delegable in determining whether there was design or neglect of the ship-owner personally within the provisions of the fire statute. See Earle & Stoddart v. Wilson Line, 287 U.S. 420, 427, 53 S.Ct. 200, 77 L.Ed. 403. There was not any negligence in the delegation of the duty to plan and supervise the stowage of the meal to Captain Fegen, an experienced Lloyd's agent marine surveyor, well qualified to perform the service. Cf. Flat-Top Fuel Company v. Martin, 2 Cir., 85 F.2d 39, 42. His authority, however, was limited to supervision of meal stowage for the K Line at Kobe and to the giving of instructions to the masters with reference to such stowage. He was not a marine superintendent, general agent or managing officer of the K Line. He was simply an independent surveyor without power to control the movement, or crew of the ship, or to bind the K Line by contract. The negligent stowage of Captain Fegen was not, therefore, neglect of the owner personally, and does not deprive the K Line of its right to exoneration under the fire statute.

Prior to the loading of the "Venice Maru" the K Line had carried large quantities of meal on many occasions, but the record does not disclose what, if any, part was stowed in the lower holds on most of these voyages. It, however, is clear that meal was carried in the lower holds on at least three previous voyages, on the "Ni-

chiyo Maru", "Tohsei Maru", and "Soyo Maru"; that there was overheating on these voyages and that on two of these, the "Tohsei Maru" and "Nichiyo Maru", rice ventilators were used. Mr. Okubo, who was the acting president and general manager of the K Line, testified that he did not inform Captain Fegen or instruct anyone else to inform Captain Fegen of the experiences of the K Line, even though Mr. Okubo knew fish meal constituted a considerable portion of the cargo of the "Venice Maru", and that some part of the large shipment of meal might be stowed in a lower hold.

■ A shipowner has been held to be under a duty to give information to those who have to operate or repair his ship. See The W. D. Anderson, D.C., 17 F.Supp.· 754, affirmed 3 Cir., 94 F.2d 377, certiorari denied, Atlantic Refining Co. v. Smith, 303 U.S. 658, 58 S.Ct. 764, 82 L.Ed. 1117; The Vestris, D.C., 60 F.2d 273, 286; The Schwan, [1909] A.C. 450, 454; Standard Oil Co. v. Clan Line Steamers, Ltd., [1924] A.C. 100, 110, 114, 123, 124, 126 et seq., and it is conceivable that a like duty may in certain circumstances be imposed upon an owner regarding stowage. But in each of the cases above cited, the courts held it was unreasonable for the owner to expect anyone else to possess knowledge of an existing peculiarity of the particular ship of which information was withheld.

■ The K Line was justified in relying upon the expert knowledge of Captain Fegen, a capable and experienced surveyor, as to what was the proper method of stowing and ventilating the meal. There was not any proof that Captain Fegen did not know or was unable to find out about heating of fish meal during its transportation to United States Atlantic ports.

■ That there had been overheating, even when rice ventilators were resorted to, was knowledge that experts on stowage could reasonably have been expected to have had at the time. There was not any reason why the K Line should have suspected that Captain Fegen did not have this information. I find, therefore, that Mr. Okubo was not negligent in failing to inform Captain Fegen about the experiences of the K Line. It also follows that he was not required to issue special instructions as to stowage to officers of the "Venice Maru" since Captain Fegen, who was well qualified, was employed to do so.

■ Mr. Okubo did not know that cargo was stowed on the weather-deck until after the "Venice Maru" had sailed from Japan, or that any part of the cargo placed on the deck had been stowed on hatch covers until after the voyage had ended. He was not an expert; he did not know the details of the stowage, or that the deck cargo would have any effect upon the ventilation of No. 1 lower hold. He accordingly was not negligent in failing to make arrangements to have the cargo shipped under deck after the "Venice Maru" reached Los Angeles or in failing to consult Captain Fegen concerning the deck cargo. Nor is it probable that any change would have been made had he consulted Captain Fegen, upon whose judgment he relied, for the latter stated he believed it was unnecessary to uncover more than one-third of the hatch.

■ The stowage on deck of cargo shipped under clean bills of lading constituted a deviation, but such deviation does not deprive the shipowner of his right to exoneration under the fire statute, unless it was a cause of the fire, The Ida, 2 Cir., 75 F.2d 278, 279; Globe & Rutgers Fire Insurance Co. v. United States, 2 Cir., 105 F.2d 160, 166, and not even then, unless the deviation was the result of the neglect or design of the owner personally. See The Ida, supra. Though the stowage on the hatch may have interfered in some measure with the ventilation of the cargo under deck and may have hindered efforts to prevent the outbreak of the fire, the claimants have failed to establish that stowage on the hatch covers was the result of the design or neglect on the part of the K Line.

■ The K Line therefore is entitled to exoneration of liability under the fire statute.

The record does not disclose any negligence on the part of Kabushiki Kaisha Kawasaki Zosenjo or of any persons for whose acts it is responsible. Not having had anything whatsoever to do with the stowage or operation or control of the ship, it also is exonerated from liability under the fire statute, assuming there otherwise was liability.

The K Line refuses to return to claimants general average deposits exacted by it before delivering the cargo to them, contending that the deposits were properly exacted.

**354**

■ An owner who is exonerated from liability by the fire statute does not thereby become entitled to general average contribution. His right to contribution must rest upon an agreement. Globe & Rutgers Fire Ins. Co. v. United States, 2 Cir., 105 F.2d 160, 164.

The bills of lading contain a Jason Clause, which provides that "if the shipowner shall have exercised due diligence to make the vessel in all respects seaworthy", in case of damage resulting from unseaworthiness, the cargo owners shall contribute with the shipowner in general average. The Harter Act, 46 U.S.C.A. § 192, exempts the shipowner under certain circumstances from liability for damage which otherwise would exist "if the owner of any vessel * * * shall exercise due diligence to make the said vessel in all respects seaworthy".

■ The Harter Act, Section 3, 46 U.S.C.A. § 192, does not apply in case the owner or any of the owner's agents fail to use due diligence to make the vessel seaworthy. See Earle & Stoddart v. Wilson Line, 287 U.S. 420, 426, 53 S.Ct. 200, 77 L.Ed. 403. The Jason Clause refers to the due diligence of the owner in words almost identical with those used in Section 3 of the Harter Act. It accordingly may be assumed that the words were used with the same meaning and effect, and that the owner is not entitled to contribution if his agents fail to exercise due diligence.

Moreover, 46 U.S.C.A. § 191 provides that it shall not be lawful for any owner to insert in any bill of lading any agreement whereby the obligation of the owner to exercise due diligence to make the vessel seaworthy or to stow her cargo carefully shall in any wise be lessened or avoided. To allow the owner contribution in case of his agent's negligence would violate this provision, since it would lessen his liability in situations in which 46 U.S.C.A. § 192 would not relieve him thereof.

■ The stowage of the meal on the "Venice Maru" was negligent and made the vessel unseaworthy. Since "due diligence" had not been exercised by Captain Fegen, the Jason Clause does not apply and the general average deposits must be returned with interest.

Findings of facts, conclusions of law and a decree in accordance herewith are to be submitted.