Petition of SKIBS A/S JOLUND as owner of THE M/S BLACK GULL for exoneration from or limitation of liability.
AMERICAN SMELTING & REFINING COMPANY, Atkinson Haserick & Co., et al., Libelants-Appellants,

v.

BLACK DIAMOND STEAMSHIP CORP., Respondent-Appellee.

Maria VERBEECK et al., Libelants-Appellants,

v.

BLACK DIAMOND STEAMSHIP CORP., Respondent-Appellee.

No. 353, Docket 24481.

United States Court of Appeals Second Circuit.

Argued May 13, 1957.

Decided Nov. 29, 1957.

Rehearing Denied Jan. 16, 1958.

Abberley Kooiman & Amon, New York City, for passenger-claimants-appellants; John J. Abberley, New York City, and James D. Gordon, Brooklyn, N. Y., of counsel.

Pyne, Brush, Smith & Michelsen, New York City, for petitioner-appellee, Skibs A/S Jolund; Warner Pyne, Dudley C. Smith, and Vincent J. Ryan, New York City, of counsel.

Bigham, Englar, Jones & Houston, New York City, for cargo and death claimants-libellants-appellants; Henry N. Longley and John W. R. Zisgen, New York City, of counsel.

Dow & Stonebridge, New York City, for respondent-appellee; Daniel L. Stonebridge and Raymond W. Mitchell, New York City, of counsel.

Before CLARK, Chief Judge, and SWAN, and POPE, Circuit Judges.

POPE, Circuit Judge.

The proceedings in the court below grew out of a fire which occurred on the Norwegian M/S Black Gull on July 18, 1952, while she was on a voyage from North European ports to New York. Four members of the crew lost their lives; most of the cargo was either de-

stroyed or damaged, and the vessel became a constructive total loss. These proceedings were three in number: the first was one for exoneration from or limitation of liability instituted by Skibs A/S Jolund, owner of the Black Gull; the second was a suit for non-delivery of and damage to the cargo which was on board at the time of the fire (the libelants in that suit are the owners or underwriters of the cargo, and the respondent was Black Diamond Steamship Co., time charterer of the Black Gull, on its own behalf and on behalf of the Master); and the third proceeding was one to recover for the wrongful death of one of the lost seamen brought by his widow and children against the Black Diamond Steamship Corp.

The facts leading up to the fire and the loss are set forth in the second amended memorandum of the trial judge, as follows: "The vessel left Rotterdam on July 10, 1952, bound for United States east coast ports, the first of which was to be New York. She carried general cargo below decks which had been loaded at Bremen, Hamburg, Antwerp and Rotterdam. In addition, she carried on the weather deck approximately five hundred fifty tons of crude naphthalene in previously used jute or burlap bags which had been loaded in Antwerp and Rotterdam. The vessel on this voyage was manned by a crew of forty and carried nine passengers.

"The crude naphthalene was stowed about six bags high. The stow covered both port and starboard sides of the afterdeck over an area of some 13–16 feet wide and approximately 90 feet long. The forward weather deck of the vessel, both port and starboard, contained an approximately similar stow of bagged crude naphthalene. In athwartship direction, the stow started just inboard of the bulwarks and continued to a line about three feet out from the sides of the hatch coamings. A dunnage fence kept the stow clear of the bulwarks and permitted a three foot wide passageway through which members of the crew could pass. This passageway also kept sounding plugs and hose connections available to the crew. The stow was secured in place by rope nets but was otherwise uncovered.

"On the evening of July 18, 1952, the vessel passed the Nantucket Shoals Light on her way to New York. At about eleven o'clock, the deck officer, standing on the starboard wing of the bridge, heard what he described as 'a hollow dull dump' from the afterpart of the vessel. Looking in that direction, he saw smoke and a small flame coming from the after weather deck port side abreast number 4 hatch about 100 feet from his position on the bridge. After ordering water on deck, he went to the area in the vicinity of the smoke. He there saw fire in the middle of the top of the load and fire on the side of the load between the second and third tiers from the top.

"Although an attempt was made to extinguish the fire it was necessary to abandon the vessel about four and a half hours after the fire was discovered."

The libel of the cargo owners against Black Diamond Steamship Corp. (here called Black Diamond), after referring to the shipments, and bills of lading therefor, alleged: "The shipments described on Schedule 'B' either have not been delivered at all to the persons entitled thereto or have been delivered to them short, slack and seriously injured and damaged, and such parts of said shipments as have been delivered were, at time of delivery, subject to alleged liens for salvage and other charges not contracted for in the said bills of lading."

Black Diamond asserted non-liability under the Carriage of Goods by Sea Act (U.S.C.A. Title 46, § 1304(2)), which provides that the carrier shall not be responsible for loss or damage from fire "unless caused by the actual fault or privity of the carrier." These cargo owners, appellants here, claim there was fault or negligence on the part of Black Diamond's managing agents, in failing

to protect or cover the deck stow of bagged naphthalene from the direct rays of the sun so as to avoid heating and to protect from the foreseeable possibility of ignition from sources such as sparks, lighted cigarettes or cigar butts.

The court made no finding as to whether Black Diamond was guilty of negligence in these respects for it held that any failure to cover the bags of naphthalene could not have been a contributing cause of the fire; that coverage of the stow would not have prevented the fire. In its Finding 36, that there was lack of proof that any such failure to cover the stow was a proximate cause of the fire, the court said: "Even if it be assumed that failure to cover the stow of bagged naphthalene with a tarpaulin was either negligence or in violation of controlling statute or regulation, libellants have not proved that that failure was a proximate cause of the fire." Its key findings as to lack of causation are its Nos. 29 and 35, as follows: "29. The sun's rays could not have caused or contributed to the cause of the fire." "35. The failure to cover the bags of naphthalene on the 'Black Gull' with a tarpaulin was not and could not have been a contributing cause of the fire." Findings 30 to 34 inclusive were evidently intended to be explanatory of one reason for the court's finding of lack of proof of causation,[1] stated in the court's second amended memorandum as follows: "2. In discussing this possibility of outside ignition, I shall assume, without deciding the question, that the failure to cover the stow with a tarpaulin was either negligent or in violation of a controlling statute

or regulation. I therefore turn to the question whether this failure to cover the stow with a tarpaulin proximately caused the fire.

"Libelant's argument that a tarpaulin would have prevented ignition from an external source runs something like this. The danger of ignition of crude naphthalene is increased by heating. As the temperature rises, greater amounts of readily-ignitable gases are given off. Since the temperature in the area of the stow was in excess of 120° F., the naphthalene was giving off a substantial quantity of gases which impregnated the bagging and made the bagging susceptible to ignition from a spark or cigarette butt. In addition, the bagging was impregnated with creosote oil from the crude naphthalene which is also readily ignitable. From these allegations libelants argue that a tarpaulin would have protected the stow from heating by the direct rays of the sun and would have prevented contact between a spark or cigarette butt and the bagging impregnated with creosote oil and gases.

"I cannot accept libelants' contention. First of all, the testimony is overwhelming that the sun's rays could not have caused or contributed to the cause of the fire. Both Dr. Purdy, respondent's expert, and Mr. Aeby whom libelants assert to be 'the leading European authority on dangerous cargo,' unequivocally state this conclusion. Therefore, the presence of a tarpaulin, by protecting the stow from the sun's rays, would not have prevented this fire.

"Nor would a tarpaulin have afforded protection from ignition due to creosote

1. These are as follows: "30. Tarpaulins are inflammable.

"31. Coverage of the stow of bagged naphthalene with a tarpaulin would not have prevented the fire on the 'Black Gull.'

"32. A tarpaulin coverage would not have afforded protection from ignition due to creosote oil or gases. A tarpaulin could have afforded protection only if the creosote oil or gases could not impregnate the tarpaulin or if the tar-

paulin itself was not inflammable. Neither is the fact.

"33. The gases given off by crude naphthalene would permeate or saturate tarpaulins which covered bagged naphthalene.

"34. Creosote oil from the crude naphthalene and the gases given off by the crude naphthalene could have impregnated a tarpaulin covering bagged crude naphthalene and would thereby make the tarpaulin as inflammable as the impregnated bagging."

oil or gases. A tarpaulin could have done so only if the creosote oil and gases could not impregnate the tarpaulin or if the tarpaulin was itself not inflammable. Neither is the fact. Libelants' Exhibit 38, an order issued by respondent that naphthalene must not be stored on hatches contains the sentence 'This material permeates tarpaulins and hatch boards and in a recent instance damaged cargo and necessitated replacement of ceiling.' Thus the creosote oil and gases could impregnate the tarpaulin and thereby make the tarpaulin as inflammable as the impregnated bagging."

If we assume, as did the trial judge, that the failure to cover the stow was negligence, it is our opinion that the quoted findings to the effect that the failure to cover the naphthalene could not have been a contributing cause of the fire, were clearly erroneous. Noting the court's reference, in the portion of the opinion last quoted, to the testimony of Dr. Purdy and Dr. Aeby, it seems probable that the trial judge misinterpreted what they said. In the quoted portion of the opinion the court found that the temperature in the area of the stow was in excess of 120° F. Dr. Aeby, testifying on deposition as an expert witness for the cargo owners, stated that even at 70° to 75° F. particles of naphthalene gas would be liberated into the air, and (as the court found), that "as the temperature rises naphthalene gives off increasing amounts of gas"; and that those gas particles which are given off will ignite at a temperature of approximately 125° F. which is the "flash" point of pure naphthalene.[2]

It is true that in answer to a hypothetical question reciting the temperatures recorded in the log book on the vessel during the period of July 11 through July 18 (the day on which the fire broke out), Dr. Aeby testified that, based on an assumption of certain named maximum temperatures, it would be his opinion that the rays of the sun could not have been a cause or contributing cause of the fire. But these named temperatures were immaterial. Apparently the Judge overlooked the fact that these temperatures stated in the hypothetical question were taken inside the chart room on the bridge and in the shade. The highest temperature taken there was 25° centigrade or 77° F. recorded at noon on July 18 (the day of the fire). That was not the important temperature;—the important one was the temperature in the area of the stow found to be in excess of 120° F. at which time, the court's opinion says, "the naphthalene was giving off a substantial quantity of gases which impregnated the bagging and made the bagging susceptible to ignition from a spark or cigarette butt."

Both Dr. Aeby and Dr. Purdy (who was Black Diamond's expert), testified that the temperature on the deck which was exposed to the sun would be much higher than that on the bridge in the shade. Dr. Purdy also testified that the quantity of gas given off would be increasingly greater as the temperature rose; and that in his opinion there was no possibility that the sun's rays would raise the temperature to the point where the gas would ignite. But it is noted that it is not the theory of the appellants that the gas would ignite because of the heat alone. Dr. Purdy's testimony seems to mean that the temperature where the cargo was stored was never high enough to cause it to burst into flame unaided by an ignited flame. This does not sustain a conclusion that the sun's rays could not have "contributed to the cause of the fire."

The record shows that the rays of the sun increased the heat of the deck cargo and as the heat increased the amount of gas released became greater and

2. Dr. Snell, an expert testifying for libellants, stated that the flash point of crude naphthalene was "somewhat lower" than that of pure naphthalene. Dr.

Aeby said he could not tell the precise flash point of this crude naphthalene without testing the particular product.

greater. The recorded bridge temperatures indicated that the hottest day was the day the fire broke out; as shown in the court's opinion, the temperature at this point exceeded 120° F. The gas would, according to the testimony of Capt. Hollaar, Black Diamond's marine superintendent, mix with the air and form an explosive mixture. Plainly enough such gas was a dangerous substance, and in view of the likelihood of ignition by sparks, burning cigarettes or cigars, the production of excess quantities of the gas could well be the proximate cause of the fire.

Another respect in which it would appear that the trial court was led mistakenly to conclude that failure to cover the bags of naphthalene could not have been a contributing cause of the fire was in its failure to note the substantial evidence in the record that a tarpaulin coverage would have afforded protection from ignition. The trial court's views with respect to the efficacy of a tarpaulin are expressed in its findings, Nos. 30–34 inclusive, set forth in footnote 1, supra. They are also expressed in the last paragraph of the portion of the opinion which we have quoted above. The Judge's theory, there disclosed, is that if the stow had been covered by a tarpaulin, the gases and the creosote oil given off by the crude naphthalene would have impregnated the tarpaulin or saturated it and made it as inflammable as the impregnated bagging. There is no such evidence in the record.

Evidently the trial judge thought that libelant's exhibit 38 tended to support his view that the gases and oil would permeate a tarpaulin used to cover the bagged naphthalene; but exhibit 38 has no reference to a tarpaulin so used. It is a directive addressed by Black Diamond to all masters and mates and dated March 30, 1933. Assuming that the fact that the libelant introduced this exhibit takes away from it its self-serving character, it refers not to tarpaulins used to cover a stow of naphthalene but it is a directive against stowing naphthalene on hatches.[3] If naphthalene were piled on a hatch or hatch cover which in turn was covered by a tarpaulin, the likelihood of the creosote oil under the pressure of the pile permeating the tarpaulin could readily be conceded without its having any bearing whatever on what would happen to a tarpaulin which was used to cover a stow of bagged naphthalene. The law of gravity makes the difference.

With respect to tarpaulins used for covers, there was evidence to the effect that they would serve the purpose of aiding in preventing fire. Dr. Snell, an expert called by libelants, testified that tar had not been used in water proofing of tarpaulins for generations; that in modern times the cloth of a tarpaulin is treated with chlorinated paraffine which serves the purpose of both waterproofing and flameproofing. Capt. Hollaar testified that tarpaulins used on Black Diamond's ships were impregnated with material to make them watertight. There is no evidence in the record that gas would permeate a watertight tarpaulin. Capt. Hollaar testified further that if the outside source of ignition were a cigar or cigarette butt, it would be much less likely to ignite the stow if it were covered by tarpaulin than if the stow were uncovered. Perhaps the most persuasive proof that the trial court must have been mistaken in its belief that covering the stow with a tarpaulin would be wholly ineffective to prevent fire, is furnished by the regulations of the United States Coast Guard. Under those regulations naphthalene, crude or refined, is classified as a

---

3. The communication stated in exhibit 38 reads as follows: "To All Masters & Mates: 'Naphthalene' Under no circumstances is naphthalene to be stowed on hatches. This material permeates tarpaulins and hatch boards and in a recent instance damaged cargo and necessitated replacement of ceiling. This commodity therefore is to be stowed on steel decks only."

hazardous article, and its stowage is required to be under cover.[4]

Regulation 146.27–6 provides as follows: "Protection for 'on deck' stowage.—Hazardous articles that are permitted stowage 'on deck in open' or 'on deck protected' may be protected by the use of structural erections, awnings, or tarpaulins."

Regulation 146.03–34 recites that under the regulations stowage terms are defined as follows: "(b) On deck protected means the articles may be stowed on the open weather deck of a vessel. It is required that dangerous cargo stowed under such conditions shall be protected from the elements by structural erections or from the direct rays of the sun by means of awnings or dunnaging."

It seems to us significant that in the Coast Guard regulations tarpaulins are an approved method of protection for hazardous articles with no suggestion whatever that they are not suitable for protection of bagged naphthalene.[5]

We hold therefore that this case cannot be disposed of on the basis of the court's erroneous finding that there was no proof of proximate causation. This means that the trial court should have made findings upon the question of whether there was negligence on the part of Black Diamond in the respect claimed by the appellants, namely, the failure to cover the cargo to protect it from the sun and from outside ignition.

■ Of course to charge Black Diamond with negligence sufficient to establish liability, it must appear that the negligence was with "the actual fault or privity of the carrier." If the failure to cover the cargo here was negligence, it was plainly "that of an executive officer, manager or superintendent whose scope of authority includes supervision over the phase of the business out of which the loss or injury occurred."[6]

■ Capt. Hollaar, who did not hesitate to assume full responsibility for the way in which the bagged naphthalene was stowed, was a supervisory and executive official in this sense. He had general supervision over all matters relating to the loading of ships for Black Diamond in the ports of Hamburg, Bremen, Rotterdam and Antwerp. He was the company's European marine superintendent. As the court found, he was "in complete charge of all matters of stowage on vessels under charter to respondent and had no superior in Europe." There is no contention that Capt. Hollaar was not Black Diamond's alter ego in Europe, or that he was not

4. These regulations provide under the heading of "Required Conditions for Transportation" with respect to naphthalene and on a cargo vessel as follows: "Stowage: 'On deck protected.' 'On deck under cover.' 'Tween decks readily accessible.' 'Under deck (in a cool, dry, well ventilated hold).' "

5. In its findings the court ignores the regulations' reference to "structural erections" and "awnings." Some witnesses for the owner and for Black Diamond testified that in their view those would be impractical and on a cargo vessel would be carried away in storms. One who testified that awnings were impractical was a Capt. Tang, an employee of another steamship company. This is the same witness who essayed an interpretation of the Coast Guard regulations by stating that it was his view that the words "on deck protected" meant "protected against the sea, to be lost overboard, the bags torn open, or the cargo scat-

tered." He said that this protection was afforded by the "forecastle head, bulwark and hatch coamings." The Captain's interpretation of the Coast Guard regulations was plainly in direct conflict with the express language of the regulations quoted above. Capt. Hollaar had no such understanding as had Capt. Tang, for he testified as follows: "Q. And you knew that under the Coast Guard regulations of the United States if carried on deck it must be under cover or protected by awnings or tarpaulins? A. I knew that the Coast Guard regulations read that way. Q. You knew that the naphthalene on 'Black Gull' was not so covered? A. Yes."

6. The quoted language is from Coryell v. Phipps, 317 U.S. 406, 410, 63 S.Ct. 291, 293, 87 L.Ed. 363. The court was there discussing the meaning of the phrase: "privity or knowledge" in connection with a limitation of liability proceeding. The same test is applicable here.

performing with authority duties of a managerial nature. Cf. The Edmund Fanning, D.C.S.D.N.Y., 105 F.Supp. 353, 364, 369, affirmed on this point, 2 Cir., 201 F.2d 281, 284.

Capt. Hollaar participated in the preparation of the loading plan for the Black Gull before her departure; he knew that she was to carry naphthalene which was to be loaded on deck; he saw it when loaded, and saw that it was not covered. He knew that the naphthalene was volatile; that gas would escape and that when mixed with air it could form an explosive mixture; that naphthalene was classified as hazardous cargo; and he had read many handbooks on dangerous cargoes including that of Dr. Aeby. This book, a standard authority on the topic, described and classified various types of dangerous goods, that is, those defined in the book as "those which of themselves or by reason of chance circumstances may give rise to difficulties or cause accidents during transport by boat." The book stated that "By inflammable, * * * we understand a substance which at a more or less high temperature, gives off such gases as, in the presence of a naked flame, ignite or explode. The temperature at which this phenomenon occurs is called 'flashing point' or 'flash point' and is determined by the Abel-Pensky apparatus." The author then lists the flash points of some 38 chemical compounds in which appears "naphthalene—125° F." The book contains recommendations for packing and stowage of various kinds of goods and under the head of naphthalene the recommended stowage is stated as follows: "Stowage: On deck, covered and protected from the rays of the sun or under deck, in a cool and well-ventilated compartment, away from living quarters and foodstuffs." Capt. Hollaar also acknowledged familiarity with the regulations of the U. S. Coast Guard relating to dangerous articles on board vessels to which we have previously referred.

There was also evidence of a Dutch shipping decree in effect when this vessel left Rotterdam which contained a regulation relating to the stowage of naphthalene on board ship reciting that such stowage should be "On deck protected from the sun's rays; or below deck in a well-ventilated, dry hold, in a cool place." We note also that the same Dutch regulation provided: "Open fires and smoking near a cargo of naphthalene must be prohibited."

This reference to smoking suggests that which requires no specific evidence, namely, that in the circumstances of this case, the likelihood of ignition of the gas by a spark from the stack or burning cigarettes or cigar butts was foreseeable.[7] The foreseeability of such an occurrence is evidenced not only by the fact of the making of the quoted provision concerning smoking in the Dutch regulations, but it is a matter of common knowledge that where smoking goes on the smokers are likely to throw away burning cigarettes or cigars. One cannot drive through a national or state forest without being reminded by road signs of this common fact of life. The court found that certain of the passengers smoked on the voyage, as did certain of the officers and crew. It found that the passengers smoked on the weather deck, the boat deck, the sun deck and the bridge deck.[8] Some of the passengers smoked on the boat deck after dinner on the evening on which the fire started. Some of the crew smoked on the main deck. It was also

---

**7.** Dr. Snell stated that the bagged naphthalene itself might be ignited directly from a cigarette. His theory was that since a burning cigarette produces a temperature of at least 500° F., and naphthalene melts at 174° F., if a cigarette fell on a bag the naphthalene would melt and be absorbed by the bagging material, which would act like a wick in a candle, thus igniting the whole contents of the bag.

**8.** There were five or six "No Smoking" signs, some of which were visible from the boat deck, and in the cabins were signs warning against throwing cigars or cigarettes out of port holes, or over the side.

found that there were no receptacles on any of the decks for burnt cigars, cigarettes or matches. The uncovered stow of the naphthalene aft the court found extended to within approximately 6 feet of the boat deck.

Without making any finding as to whether the fire occurred through spontaneous combustion the court referred to it by finding that "there is a theoretical possibility of spontaneous ignition of the bags containing the naphthalene," and that "spontaneous combustion of the bagging cannot be eliminated as a possible cause of the fire." The court further found that pure naphthalene is not susceptible to spontaneous ignition, but that none of the bags in which it was packed had been tested for susceptibility to spontaneous ignition.

Appellants argue that the fire could not have resulted from spontaneous combustion. But even if there had been evidence of a possible spontaneous combustion, clearly enough the dangerous substance was the gas produced by the heat. Increased heat would increase the volume of gas and failure to protect the stow from the direct rays of the sun could well constitute a contributing cause of a fire from spontaneous combustion. Assuming that spontaneous combustion was possible, it would be foreseeable that a likelihood of that taking place would be increased as the heat and the gas increased. In other words, the danger was foreseeable whether it came about through sparks, cigarettes or spontaneous combustion.

■ The cause must therefore be remanded for further findings on two issues:

(1) Was it negligent to fail to cover the cargo from the sun?

(2) If so, was the negligence the cause of the damage?

■ In passing upon the question of negligence, it is not important that the vessel had not entered United States waters when the fire occurred so that Coast Guard regulations had not then become operative as a controlling or binding statute. The court can consider these and the Dutch regulations as a norm or standard of care. With these the court may consider such facts of common knowledge as the tendency of smokers to throw away lighted butts; the fact that the wind blowing across the boat deck on the day the fire occurred would tend to carry a tossed cigarette in the direction of the bagged naphthalene; that the direct rays of the sun cause heat, and in a confined area out of the wind, the heat tends to increase further. The court may consider the feasibility of precautions, such as covering with tarpaulin, or the furnishing of what the Coast Guard regulations describe as "structural erections," or "awnings." We cannot say that there are no other feasible methods for protecting cargo from the sun. Some of Black Diamond's witnesses objected to tarpaulin covers as likely to hold and trap the gas from the naphthalene. We cannot say as a matter of law on this record that a tarpaulin over the top, but not over the sides of the cargo would not be feasible. This gas is heavier than air. Some of the same witnesses testified that many cargo carriers stowed naphthalene in the same manner here employed.[9] Proof of trade practice is not proof of what constitutes due care in the premises, nor is the utilization of reasonably required safety devices excused merely because they involve additional expense.

■■ On the question of causation the court may find that the increased amount of gas generated by the sun's heat was confined to the top layer of burlap bags and was rapidly dissipated by the wind, so that it was not a cause

9. Although Capt. Hollaar testified that Black Diamond's practice was to carry crude naphthalene on deck uncovered, he recalled instances in which such cargo had been covered on the insistence of the shippers. It also appeared that competition had compelled Black Diamond to accept shipments of naphthalene for "under deck" stowage.

of disaster, or it may find that the sun heated the bags despite the breeze. Failure to negative completely the possibility of spontaneous combustion does not prevent recovery here if it is shown that the catastrophe was in fact caused by negligent failure to protect the cargo from the sun. Whether the spark that triggered the fire was spontaneous or from a cigarette, the liability of the persons responsible for failing to keep the sun off is the same.

### The Verbeeck Case Against Black Diamond

 Verbeecks' libel bases its claim for recovery against Black Diamond for the death of this Belgian seaman on the provisions of the Death on the High Seas Act, Title 46 U.S.C.A. §§ 761–768, which provides a cause of action for death "caused by wrongful act, neglect, or default occurring on the high seas."[10] It was stipulated that under the law of Norway a similar right of action for death by wrongful act is granted the widow, children and other dependents of a Belgian seaman employed on a Norwegian ship.

What we have said above with respect to the sufficiency of the proof of negligence and of the proximate cause of the fire makes it necessary that on Verbeecks' appeal from the decree dismiss-

ing their libel against Black Diamond the cause be remanded for findings on those questions.[11]

### The Appeals From the Decree Exonerating Skibs A/S Jolund

The decree granting exoneration to the owner of the vessel is challenged by three groups of appellants: the cargo owners, the seven passenger appellants, and the Verbeecks.

As for the cargo owners, the controlling enactment is the Fire Statute, Title 46 U.S.C.A. § 182,[12] which provides the owner exemption from liability for loss to cargo by fire "unless such fire is caused by the design or neglect of such owner." These appellants assert that such "design or neglect" was established here by proof that one Capt. Svendsen was a managing officer representing the owners and whose scope of authority included supervision over the phase of business out of which the loss or injury occurred, within the meaning of Coryell v. Phipps, supra. The owner was a Norwegian corporation and all matters pertaining to the management and maintenance of the vessel were in the hands of Sigurd Herlofsen & Co., also a Norwegian corporation, as manager for the owner. As the court found, the entire management of the ship was entrusted to the latter corporation. Capt. Svendsen was em-

---

10. "§ 761. Right of action; where and by whom brought—Whenever the death of a person shall be caused by wrongful act, neglect, or default occurring on the high seas beyond a marine league from the shore of any State, or the District of Columbia, or the Territories or dependencies of the United States, the personal representative of the decedent may maintain a suit for damages in the district courts of the United States, in admiralty, for the exclusive benefit of the decedent's wife, husband, parent, child, or dependent relative against the vessel, person, or corporation which would have been liable if death had not ensued."

"§ 764. Rights of action given by laws of foreign countries—Whenever a right of action is granted by the law of any foreign State on account of death by wrongful act, neglect, or default occurring upon the high seas, such right may be maintained in an appropriate

action in admiralty in the courts of the United States without abatement in respect to the amount for which recovery is authorized, any statute of the United States to the contrary notwithstanding."

11. We are not required by this record to pass upon the question whether, as concerns Verbeecks' case against Black Diamond, the latter might be chargeable with negligence on the part of the ship's officers in failing to prevent smoking by passengers.

12. "§ 182. Loss by fire. No owner of any vessel shall be liable to answer for or make good to any person any loss or damage, which may happen to any merchandise whatsoever, which shall be shipped, taken in, or put on board any such vessel, by reason or by means of any fire happening to or on board the vessel, unless such fire is caused by the design or neglect of such owner."

ployed by Sigurd Herlofsen & Co. He states in his deposition that he became head of the Marine Department of Sigurd Herlofsen & Co. on January 6, 1954; but in June and July, 1952, when the fire occurred, he had not been appointed to this position. In response to an inquiry as to where he was then employed by the employing corporation, he replied, "I was in the Marine Department in the office in Oslo." At that time the head of the Marine Department was a Captain Wellton. Capt. Svendsen testified: "I just had the work given to me by Capt. Wellton. For instance, I might be sent out on a ship as a captain, or anything that he thought he needed me for." He said that he knew that ships under charter to Black Diamond carried cargoes of naphthalene in that fashion; but he had never discussed with any officer of Sigurd Herlofsen & Co. the manner of stowage on the Black Gull or any other vessel chartered to Black Diamond.

The only finding made by the trial court concerning Capt. Svendsen was its finding No. 70 as follows: "At and before the time of the voyage here involved, it was personally known to Capt. Inge Svendsen, who assisted the head of the Marine Department of S. Herlofsen & Co., which managed the 'Black Gull' for petitioner, that respondent customarily carried bagged naphthalene on deck on vessels which it chartered from petitioner, covered only by manila rope netting." No doubt, because of its findings that there was lack of proof of causation of the fire, the trial court considered it unnecessary to make a specific finding as to whether Capt. Svendsen was an executive officer, manager or agent.

In the case of Consumers Import Company v. Kabushiki Kaisha, 320 U.S. 249, 64 S.Ct. 15, 88 L.Ed. 30, the negligence to which the loss of cargo by fire was attributable, was that of one Captain Fagen who had been employed to supervise stowage on the ship in question. (The facts were discussed at length when the case was in this court, 133 F.2d 781.) But in that case the trial court had found that Captain Fagen's "authority, however, was limited to supervision of meal stowage for the K Line at Kobe and to the giving of instructions to the masters with reference to such stowage. He was not a marine superintendent, general agent or managing officer of the K Line." The Venice Maru, D.C., 39 F.Supp. 349, 352.

While the court below might well upon the record here have made a similar finding with respect to Capt. Svendsen, it did not do so. The court's conclusion of law No. 7 was as follows: "The fire was not caused by the design or neglect of the petitioner and the Fire Statute is a complete defense as to all claims for cargo loss or damage." This conclusion appears to be based upon the trial court's findings that there was no proof that the fire was caused by any neglect or negligence whatever. Admiralty Rule 46½, 28 U.S.C.A. contemplates that the findings of fact and the conclusions of law shall be stated separately.[13] If the court intended its conclusion No. 7 to be a finding of fact that the representative of the owner charged with negligence was not of managerial rank, it did not say so. The conclusion, as worded, is susceptible of interpretation as having been predicated solely on findings of a lack of causation.

██ For reasons previously stated in discussing the question of Black Diamond's liability, we hold that there was evidence from which the court might have found that the fire was caused by negligence in the manner of stowage of naphthalene and the failure to cover it. Should the court find, as did the court in The Venice Maru, supra, that Capt. Svendsen was not a general agent or managing officer, then the owner will be entitled to exoneration as against the cargo owners. Should the court find that

13. "In deciding cases of admiralty and maritime jurisdiction the court of first instance shall find the facts specially and state separately its conclusions of law thereon; * * *"

Capt. Svendsen was a managing agent, then the court must determine whether any neglect or failure to act on his part constituted negligence, and if so, whether the same was a proximate cause of the loss.

■■■■■ With respect to the claims of passengers-appellants, the Fire Statute is inapplicable as it concerns loss or damage to merchandise only. The passengers are entitled to the benefit of the rule stated in Title 46 U.S.C.A. § 183 (e) as follows: "In respect of loss of life or bodily injury the privity or knowledge of the master of a seagoing vessel or of the superintendent or managing agent of the owner thereof, at or prior to the commencement of each voyage, shall be deemed conclusively the privity or knowledge of the owner of such vessel."

Since 1949 the Captain had been acquainted with the American Coast Guard regulations and knew that they required that naphthalene when carried on deck should be covered. As one acquainted with the regulations he should have known that they classified naphthalene as a dangerous cargo.

■■■■■ As for the claim of Verbeecks against the owners, it is plain that they also are entitled to the benefits of § 183(e) quoted above. The owner, differing from Black Diamond,[14] is entitled to the benefits of the Limitation of Liability Act, 46 U.S.C.A. § 183, as against a claimant under the Death on the High Seas Act (In Re Wood's petition, 2 Cir., 230 F.2d 197), which contains special provisions relating to claims for loss of life or bodily injury.

In view of what we have said heretofore concerning the claims of the passengers and the issues in the action of the Verbeecks against Black Diamond, it is apparent that the cause must be remanded for further findings respecting the issues as between the Verbeecks and Skibs A/S Jolund.

The decrees are reversed and the cause is remanded for further proceedings consistent with this opinion.

### On Petitions for Rehearing

Upon petitions for rehearing appellees assert that our opinion is in error in stating that there was no evidence to support the trial judge's theory, based on Exhibit 38, that naphthalene "permeates tarpaulins and hatch boards," and that "the creosote oil and gases could impregnate the tarpaulin and thereby make the tarpaulin as inflammable as the impregnated bagging."[1] Appellees say there is credible uncontradicted evidence that the gases and oils would impregnate or saturate a tarpaulin and "make it as inflammable as the impregnated bagging."

Our opinion makes plain why we think the trial court misunderstood or misinterpreted Exhibit 38, and why we consider the findings drawn therefrom clearly erroneous. As for the contention of the petitions that there was other evidence to support the judge's view of Exhibit 38, we cannot so read the record. The witnesses whose testimony is listed by petitioners carefully avoided saying any such thing.[2] One said that *if* a tar-

---

14. Which is not an "owner" within the meaning of the Act, Gilmore and Black, The Law of Admiralty, 1957, p. 673; Benedict, The Law of American Admiralty, 6th ed., § 497.

1. "The Judge's theory, there disclosed, is that if the stow had been covered by a tarpaulin, the gases and the creosote oil given off by the crude naphthalene would have impregnated the tarpaulin or saturated it and made it as inflammable as the impregnated bagging. There is no such evidence in the record."

2. Thus Black Diamond quotes Captain Hollaar's testimony as follows:

"Q. Captain Hollaar, it has been suggested by Mr. Longley if the tarpaulin were put over the stow of naphthalene it would become, to use his words, permeated with naphthalene. Captain, in your opinion, would a tarpaulin which had become permeated with naphthalene be about as inflammable, more inflammable or less inflammable, than burlap bags? A. Well, if it had become permeated with naphthalene of course it

paulin became impregnated with *naphthalene* it would become inflammable. Others said if tarpaulins were used for cover they would be impregnated with the "odor" or "smell" of naphthalene. No testimony supported the court's theory, mistakenly deduced from Exhibit 38, that use of a tarpaulin as a cover would *"make the tarpaulin as inflammable as the impregnated bagging."* The trial court's theory was dependent upon this "as inflammable." If, as Capt. Hollaar testified, a cigarette or cigar butt "would be much less likely to ignite the stow if it were covered by tarpaulin than if the stow were uncovered," then the theory of lack of causation falls to the ground.

 Again petitioners challenge our statement that the trial judge's opinion described the deck temperature as "in excess of 120° F." It says this was a mere recital of libelant's argument. We do not so read the judge's opinion. The finding as to bridge temperatures, in the shade, was irrelevant. The evidence in the record shows that the 120° F. which the judge took as being accurate, was in fact so. It was arrived at by adding to the 77° bridge temperature the 43° difference which Dr. Purdy testified would exist in the higher temperature on deck.

As for the petitions' statement that we misread the Coast Guard regulations as requiring tarpaulin covers, reference to the opinion will show we did not say that. In footnote 4 we listed the alternative "Required Conditions for Transportation." One of these is "on deck protected." Regulation 146.27–6 provides that this condition may be satisfied by the use of "structural erections, awnings, or tarpaulins." By underscoring the word "may" in the last sentence, petitioners argue this means such protections are merely permissive. This ignores the words "Required Conditions," and ignores the words "shall be protected" in Regulation 146.03–34(b) quoted in the opinion. But this is all beside the point. Libelants contended that the naphthalene might have been protected by covering with tarpaulin. Petitioners concede that the regulations say "hazardous articles *may* be protected by the use of a tarpaulin." The judge's finding was that the naphthalene *could not possibly* have been protected by such means. It is with this that we have mainly found fault.

As for the contention that the Dutch regulations, or portions thereof, were not in effect because not published, for our purposes it is of no consequence whether the Dutch regulations shown in the record had the force of Dutch law or not. Plainly they were drafted by officials who presumably knew their business. Our mention of them has not been for the purpose of disclosing any violation of any regulation having the force of law. Our reference was merely to show that like the Coast Guard regulations they represent an accepted standard of care.

The petitions for rehearing are denied.

---

would be in practically the same condition as the jute bags."

(On recross examination): "Q. Captain, are you seriously telling us as an experienced mariner that a tarpaulin is as readily ignitable as a burlap bag? A. If it was impregnated with naphthalene, I do not see any difference."

Thus the Captain carefully says: *If* the tarpaulin was impregnated with naphthalene it would be inflammable. No word from him says that a tarpaulin used to *cover* such a stow *would* become impregnated; much less that it would, as the judge seemed to think, become "as inflammable as the impregnated bagging."